499 S.E.2d 209

**The STATE, Respondent,**

v.

**Willie HICKS, Appellant.**

No. 24784.

Supreme Court of South Carolina.

Heard Feb. 4, 1998.

Decided April 27, 1998.

Rehearing Denied May 28, 1998.

208

Deputy Chief Attorney Joseph L. Savitz, III, of South Carolina Office of Appellate Defense, Columbia, for appellant.

Attorney General Charles M. Condon, Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, Columbia; and Solicitor Barbara R. Morgan, Aiken, for respondent.

BURNETT, Justice:

Appellant was convicted of murder, kidnaping, armed robbery, and possession of a firearm or knife during the commission of a violent crime. He was sentenced to death for murder, plus thirty years for kidnaping, twenty-five years for armed robbery, and five years for possession of a firearm or knife during the commission of a violent crime.

## ISSUES

I. Did the trial judge err in determining appellant used two of his peremptory strikes in a racially discriminatory

manner in violation of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and *Georgia v. McCollum,* 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992)?

II. Did the trial judge err by permitting Detective Courtney to testify charges against Simpkins had been dismissed after interviews with numerous other individuals when those individuals did not testify at trial?

III. Did the trial judge give erroneous jury instructions during the sentencing phase of trial?

## DISCUSSION

### I.

██ During selection of the original jury panel, appellant, who is black, exercised nine of his peremptory strikes to remove white prospective jurors and one peremptory strike to remove a black prospective juror from the panel. The State made a motion for a *Batson* hearing.

Appellant explained he struck Juror # 18 and Juror # 25 "to reach some jurors further down the list." [1] Appellant noted, while this explanation had previously been found unacceptable,[2] here the parties were striking the jurors in order of their qualification, not at random. He stated, if the jurors had been drawn from the entire qualified venire, he would not have struck Jurors # 18 and # 25. The trial judge ruled the explanation was unacceptable and ordered a re-strike.

The parties agreed to resume striking the jurors at Juror # 18. Ultimately, Juror # 18 was seated on the jury and Juror # 25 was seated as the first alternate. Juror # 27, one of the original panel members, was seated as the second alternate. Neither of the alternate jurors participated in the jury's deliberations.

Appellant argues the trial judge erred in ruling his explanation for striking Jurors # 18 and # 25 was not race-neutral. We disagree.

---

1. The trial judge determined appellant's explanations for striking the other eight jurors were racially neutral.

2. *See State v. Grandy,* 306 S.C. 224, 411 S.E.2d 207 (1991).

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibits the State from striking a venireperson on the basis of race. *Batson v. Kentucky, supra.* In addition, "the Constitution prohibits a criminal defendant from engaging in purposeful discrimination on the ground of race in the exercise of peremptory challenges." *Georgia v. McCollum, supra,* 505 U.S. at 59, 112 S.Ct. at 2359, 120 L.Ed.2d at 51.

At the time appellant's jury was selected,[3] a *Batson* hearing was conducted in the following manner: 1) the opponent of the peremptory strike requested a *Batson* hearing; 2) the party exercising the peremptory challenge was required to present an explanation which was racially neutral, related to the case to be tried, clear and reasonably specific, and legitimate. If the explanation did not satisfy these criteria, the trial judge could find a *Batson* violation and quash the jury panel; 3) if the explanation did meet these criteria, the opponent of the strike had the burden of proving the allegedly neutral explanation was pretextual. *See State v. Chapman,* 317 S.C. 302, 454 S.E.2d 317 (1995); *State v. Dyar,* 317 S.C. 77, 452 S.E.2d 603 (1994); *State v. Green,* 306 S.C. 94, 409 S.E.2d 785 (1991), *cert. denied* 503 U.S. 962, 112 S.Ct. 1566, 118 L.Ed.2d 212 (1992); *State v. Tomlin,* 299 S.C. 294, 384 S.E.2d 707 (1989).

In *State v. Grandy,* 306 S.C. 224, 411 S.E.2d 207 (1991), the solicitor exercised a peremptory strike to exclude a black person from the jury. The solicitor stated the reason for striking the prospective juror was "to seat other venirepersons who had not yet been presented." The trial judge ruled the reason was race-neutral; he did not require the defendant to establish pretext. On appeal, this Court concluded to the contrary:

> [T]he solicitor failed to articulate a racially neutral explanation in his assertion that he excluded the prospective black juror because he wanted to seat other venirepersons. Additionally, the solicitor did not give any reason why it was desirable to have other venirepersons seated, as opposed to

---

3. In *State v. Adams,* 322 S.C. 114, 470 S.E.2d 366 (1996), the Court adopted the *Batson* procedure set forth in *Purkett v. Elem,* 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). *Adams* was filed on April 29, 1996, one week after the jury selection in the present case began.

the black juror. The effect was the same as if no reason was given for striking the black juror. His explanation was neither clear, reasonably specific nor legitimate.

306 S.C. at 227–28, 411 S.E.2d at 209.

Quoting *Batson*, the Court stated:

[T]he prosecutor [could not] rebut the defendant's case merely by denying that he had a discriminatory motive or affirming his good faith in making individual selections. If these general assertions were accepted as rebutting a defendant's prima facie case, the Equal Protection Clause would be but a vain and illusory requirement.

306 S.C. at 227, 411 S.E.2d at 208.

The trial court properly determined appellant did not offer a clear, reasonably specific or legitimate reason for striking Jurors # 18 and # 25. Although he could anticipate which jurors would be seated, appellant offered no explanation as to which jurors he was attempting to seat or why other jurors were more desirable than Jurors # 18 and # 25.[4] "The effect was the same as if no reason was given for striking the [white] juror[s]." *Id.* Even though the jury selection method may have been different than in *Grandy*, appellant's explanation is no more persuasive than the prosecutor's explanation in *Grandy*. Accordingly, we affirm the trial judge's finding appellant failed to assert a racially-neutral explanation for striking Jurors # 18 and # 25. *State v. Dyar, supra* (the trial court's findings regarding purposeful discrimination are entitled to great deference and are to be set aside only if clearly erroneous).[5]

## II.

■ Seventy-three-year-old Andrew Hagan was killed in his home during the late morning or afternoon hours of December

---

4. For the first time on appeal, appellant explains he struck Juror # 18 in order to seat Juror # 27. He states Juror # 27 was preferable to Juror # 18 because she had lived outside the South.

5. Under the procedure adopted in *State v. Adams, supra,* the outcome *may* be different. *See Evans v. Georgia,* 217 Ga.App. 589, 458 S.E.2d 665 (1995) (in the context of its application, striking jurors to get to individuals at the bottom of the jury list was reasonable and race-neutral).

29, 1993. While his arms and legs were bound, he was stabbed over thirty-four times in the neck, chest, and abdomen, and beaten in the head with a flashlight.

Five men, including appellant and Willie Simpkins, had been at the victim's home the evening before the murder and had sold the victim construction equipment. By mid-January 1994, appellant, Simpkins, and two of the other men had been arrested and charged with the murder. There was no direct physical evidence connecting appellant or any of the other suspects with the murder.[6] The arrests were made primarily on the basis of a statement given by one of the suspects. In addition, the victim's neighbor stated she had seen a vehicle similar in description to the one driven by Simpkins at the victim's home on the afternoon of the murder.

Simpkins testified after his arrest, the police searched his mother's home and found some Canadian dimes and buffalo nickels. Simpkins' mother testified Simpkins was living with her in December 1993. She stated the police searched her home in February 1994 and found Canadian coins in her son's bedroom. Mrs. Simpkins provided the police with coins she kept in her own bedroom. She testified she had these coins for many years.

Gary Hagan, the victim's son, testified after the police processed his father's home, he looked through the home and determined nothing was missing. A couple of days later, he hired a housekeeping service to clean his father's home. Hagan testified his father had kept foreign coins in a metal can in the top drawer of his dresser. He testified after the cleaning crew left, he noticed the can was empty. Hagan testified he thought the coins had been taken by someone from the cleaning service.

On cross-examination, Hagan testified the police had showed him some coins. Hagan admitted in his February 1994 statement to the police he had identified two of the coins as being from his father's collection and had stated other coins were similar to those his father had collected. During his

---

**6.** Only the victim's blood was found at the crime scene. The victim's blood was not found on the suspects' clothes. Only the victim's son's fingerprints were found at the victim's home. The murder weapon was not located.

testimony, however, he explained his father's coins were not rare and he could not positively identify any of the coins as belonging to his father.

Approximately halfway through the State's case, Detective Courtney testified a second time. He explained he had investigated several leads from January through March 1994; none of the leads materialized.

Thereafter, the following transpired:

Q. All right, and by mid-April how about the leads with regard to the coins and Mr. Simpkins' car, where had they gone?

A. By that point in time, we'd pretty much determined that there was no specific manner for Mr. Gary Hagan to absolutely, positively identify the coins that had been obtained from Ms. Simpkins . . .

[Defense Counsel]: Objection to this, Judge.

The Court: And your objection is?

[Defense Counsel]: Mr. Hagan's statement can speak for itself. He undermines the credibility of that witness.

After a bench conference, the trial judge sustained appellant's objection, noting Detective Courtney was prohibited from commenting on the testimony of another witness. The judge stated:

He can certainly testify that they had this lead, if you address, for example, coins, which you were, he may either say they pursued that lead or they abandoned it. But as to the why, that goes to the issue of credibility, pits one witness against another, and that's for the jury to work out.

The solicitor continued her cross-examination of the detective:

Q. I asked you a question as to did you, through the course of your investigation, continue to pursue any connections with the coin information you had originally received?

A. Yes, ma'am, we did.

Q. And what did you do in regards to those coins?

A. The theory of those coins was just dismissed.

Q. And was that based on interviews with several people?

A. Yes, it was.

Q. And how about the situation with the car and any attachments of the car to the murder of Andrew Hagan?

A. Eventually, that theory was also dismissed.

Q. And that was based on results and witnesses?

A. That's correct.

Q. And we are talking about numerous witnesses you discussed?

A. Yes, ma'am.

Q. When you say you're following up, you interviewed how many people?

A. Somewhere between twenty and thirty myself, I believe. It was a very large number of people that we talked to.

Detective Courtney then testified the suspect who had given the statement providing the basis for the arrest of the four men had recanted his story. Courtney stated, as a result of a conversation with another suspect's attorney, he spoke with Danny Felder.[7] Ultimately, Felder testified he witnessed appellant stab and beat the victim and steal $210 from the victim's wallet.

Appellant now argues the trial judge erred in allowing Detective Courtney to testify the charges against Simpkins were dismissed based on interviews with individuals who did not testify at trial.[8] He maintains he was prejudiced by this testimony because it corroborated Felder's account of the crime and bolstered Felder's credibility. Appellant relies on *State v. Coleman*, 301 S.C. 57, 389 S.E.2d 659 (1990), where the solicitor stated during closing argument he had not called the two other suspects as witnesses because they did not have probative testimony.

---

7. Felder was not one of the original four suspects arrested for the victim's murder.

8. Based on *German v. State*, 325 S.C. 25, 478 S.E.2d 687 (1996), appellant agrees the testimony was not objectionable as hearsay. The fact individuals provided information exculpating Simpkins was not offered as proof Simpkins was not guilty (for the truth of the matter asserted) but, rather, for the purpose of showing why Detective Courtney dismissed Simpkins as a suspect. *State v. Brown*, 317 S.C. 55, 451 S.E.2d 888 (1994).

Appellant's only objection at trial concerned Detective Courtney's suggestion Gary Hagan's statement positively identifying the coins taken from Simpkins as the coins from his father's collection was unreliable. Appellant's objection to the solicitor pitting witnesses was sustained. Appellant offered no objection, however, to Detective Courtney's comments concerning his reason for dismissing the charges against Simpkins. Accordingly, this issue is not preserved for appeal. *State v. Byram,* 326 S.C. 107, 485 S.E.2d 360 (1997) (to be preserved for appeal, an issue must be raised to and ruled on by the trial judge).

In any event, there was no error in Detective Courtney testifying he conducted numerous interviews and, as a result, the charges against Simpkins were dismissed. *Coleman* is inapposite. Unlike the solicitor's argument in *Coleman,* Detective Courtney's testimony was based on his own knowledge and investigation and he was subject to appellant's cross-examination.

## III.

■ Appellant argues the penalty phase instructions were erroneous. Specifically, he contends the trial judge erred by charging the jury the following:

- Any decision you make with regard to sentence for the defendant must be based upon proof beyond a reasonable doubt....

- Also, you must find unanimously and beyond a reasonable doubt that the sentence you have decided to impose is the appropriate sentence in light of the record of the case.

In addition, appellant argues the trial judge erred by not instructing the jury it could "recommend life imprisonment if it found the existence of one or more statutory aggravating circumstances beyond a reasonable doubt" or "for any reason or no reason at all." Appellant contends because of these errors, a reasonable juror would have understood the given instructions as placing the burden of proof upon him to establish he should not be sentenced to death once it found the

State had established a statutory aggravating circumstance beyond a reasonable doubt.[9]

Appellant concedes "[d]efense counsel did not object to the judge's oral and written instructions." He contends because the errors were so egregious, however, the Court should address the issue on direct appeal.

This issue is not preserved for appellate review. *State v. Longworth,* 313 S.C. 360, 438 S.E.2d 219 (1993), *cert. denied,* 513 U.S. 831, 115 S.Ct. 105, 130 L.Ed.2d 53 (1994) (failure to object to a given instruction or to request a particular charge acts as a waiver of the right to complain about the issue on appeal). A contemporaneous objection is necessary to preserve errors for direct appellate review, even in cases where a death sentence is imposed. *State v. Torrence,* 305 S.C. 45, 406 S.E.2d 315 (1991).

In any event, the instructions include the following statements:

- [W]ith regard to any set of instructions that are given to you, that you take them in their whole context. Do not put any more emphasis on one portion as opposed to the other, and please make sure that you keep it in the total context that it is given to you;

- [T]he burden of proof in this proceeding is on the State....

- *If all twelve of you agree that you are satisfied beyond a reasonable doubt that one or more of the statutory aggravating circumstances existed at that time,* existed at the time the victim in this case was murdered, *then you would be authorized to impose either a sentence of life imprisonment* or death upon the defendant.

- While it is necessary that you find, beyond a reasonable doubt, that one or more of the alleged statutory aggravating circumstances existed at the time the victim was murdered in order to impose the sentence of death upon the defendant, *it is not necessary that you find beyond a reasonable doubt any mitigating circumstances existed at the time the victim was murdered in order to impose a sentence of life imprisonment rather than death upon*

---

9. Appellant did not offer any statutory mitigating circumstance.

*the defendant. You are authorized to impose a sentence of life imprisonment regardless of whether you find that any mitigating circumstances existed at the time the victim was murdered.*

(emphasis added).

A jury instruction must be viewed in the context of the overall charge. *Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368, 373 (1973); *State v. Norris,* 285 S.C. 86, 328 S.E.2d 339 (1985), *overruled on other grounds, State v. Torrence, supra.* The test for sufficiency of a jury charge is what a reasonable juror would have understood the charge to mean. *State v. Patterson,* 299 S.C. 280, 384 S.E.2d 699 (1989), *vacated on other grounds* 493 U.S. 1013, 110 S.Ct. 709, 107 L.Ed.2d 730 (1990). There is no burden of proof on a capital defendant with regard to evidence of mitigating circumstances. *State v. Bell,* 293 S.C. 391, 360 S.E.2d 706 (1987), *cert. denied* 484 U.S. 1020, 108 S.Ct. 734, 98 L.Ed.2d 682 (1988).

Considering the instructions as a whole, a reasonable juror would not have understood the burden of proof was upon appellant to establish he should not be sentenced to death once the State established a statutory aggravating circumstance or that a mitigating circumstance must be established before a life sentence could be imposed. The instructions specified the State had the overall burden of proof. Further, the charge provided, even if it found a statutory aggravating circumstance, the jury could impose a life sentence. Moreover, the jury was instructed it was authorized to impose a life sentence even if it did not find any mitigating circumstances. Similar instructions have been found adequate. *State v. Green,* 301 S.C. 347, 392 S.E.2d 157, *cert. denied* 498 U.S. 881, 111 S.Ct. 229, 112 L.Ed.2d 183 (1990).

█ Finally, the trial judge is not required to instruct the jury it could impose a life sentence "for any reason or no reason at all" where the jury is informed, as it was here, it could consider any mitigating circumstance authorized by law and could impose a life sentence even if aggravating circumstances were found. *Id.; State v. Jones,* 298 S.C. 118, 378

S.E.2d 594 (1989), *cert. denied* 494 U.S. 1060, 110 S.Ct. 1534, 108 L.Ed.2d 773 (1990). There was no error.[10]

## PROPORTIONALITY REVIEW

■ After reviewing the entire record, we conclude the death sentence was not the result of passion, prejudice, or any other arbitrary factor, and the jury's finding of statutory aggravating circumstances is supported by the evidence.[11] *See* S.C.Code Ann. § 16–3–25 (1985). Further, we hold the death penalty is neither excessive nor disproportionate to that imposed in similar cases. *See State v. Byram, supra; State v. Patterson,* 324 S.C. 5, 482 S.E.2d 760, *cert. denied* —— U.S. ——, 118 S.Ct. 146, 139 L.Ed.2d 92 (1997); *State v. McWee,* 322 S.C. 387, 472 S.E.2d 235 (1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 695, 136 L.Ed.2d 618 (1997); *State v. Elkins,* 312 S.C. 541, 436 S.E.2d 178 (1993), *cert. denied,* 511 U.S. 1063, 114 S.Ct. 1634, 128 L.Ed.2d 357 (1994); *State v. Adams,* 279 S.C. 228, 306 S.E.2d 208, *cert. denied,* 464 U.S. 1023, 104 S.Ct. 558, 78 L.Ed.2d 730 (1983).

**AFFIRMED.**

TOAL, MOORE and WALLER, JJ., concur.

FINNEY, C.J., dissenting in separate opinion.

FINNEY, Chief Justice:

I respectfully dissent and would vacate appellant's death sentence and remand for resentencing.

In my view the charge as a whole was confusing and could lead a juror to conclude incorrectly that the state satisfies its burden by proving at least one statutory aggravating circumstance beyond a reasonable doubt and then the burden shifts to appellant to prove beyond a reasonable doubt that he

---

**10.** Our decision to address the merits of appellant's argument should not be construed as eliminating the contemporaneous objection requirement.

**11.** The jury found the statutory aggravating circumstances of murder while in the commission of kidnaping and while in the commission of robbery while armed with a deadly weapon. S.C.Code Ann. § 16–3–20(C)(a)(1)(b) & (d) (Supp.1997).

should not be sentenced to death. *State v. Patrick*, 289 S.C. 301, 345 S.E.2d 481 (1986) (capital defendant has no burden of proof).

The trial judge stated in part:

[A]ny decision you make with regard to sentence for the defendant must be based upon proof beyond a reasonable doubt. . . .

Also, you must find unanimously and beyond a reasonable doubt that the sentence you have decided to impose is the appropriate sentence in light of the record of the case.

A capital jury needs to understand the following concepts: (1) it could recommend life imprisonment even if it found the existence of one or more statutory aggravating circumstances beyond a reasonable doubt; (2) it need not find a mitigating circumstance in order to impose life imprisonment; and (3) it could recommend a life sentence for any reason or no reason at all. *State v. Atkins*, 303 S.C. 214, 399 S.E.2d 760 (1990); *State v. Tyner*, 273 S.C. 646, 258 S.E.2d 559 (1979). The judge did not instruct the jury on the first and third concepts. Furthermore, the judge instructed the jury at least twice that any sentencing decision must be based upon proof beyond a reasonable doubt.

Considering the jury instructions as a whole, I believe a reasonable juror could have been confused and misled by the instruction and given the impression that there was a burden upon appellant to prove beyond a reasonable doubt that the jury should recommend mercy in the sentencing. Under these instructions, a reasonable juror could conclude the burden was on appellant to prove beyond a reasonable doubt that he should not be sentenced to death.

Accordingly, I would vacate appellant's death sentence and remand for resentencing.